**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>ex rel. [UNDER SEAL],<br><br>Plaintiff-Relator,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant. | C.A. No. ___________________<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

**FILED *IN CAMERA* AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. §3730(b)(2)**
**(Exempt from ECF)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>*ex rel*. KAREN MATHEWSON<br><br>Plaintiff-Relator<br><br>v.<br><br>PREMIER MEDICAL, INC.<br><br>Defendant. | C.A. No. 6-18-cv-165-TMC<br><br>**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

Relator Karen Mathewson, for her complaint against Premier Medical, Inc. (hereinafter, "Premier" or "Defendant"), alleges as follows:

## I. INTRODUCTION

1. This action is brought on behalf of Relator and the United States pursuant to the False Claims Act, 31 U.S.C. sections 3729, *et seq*.

2. This action concerns false and fraudulent statements, reports and claims for payment that Defendant routinely and intentionally submitted to federal and state government programs, including Medicare, Medicaid, CHAMPVA, TRICARE, and/or CHAMPUS (hereinafter, the "Government"), and to various Medicare Advantage Organizations ("MAOs") which indirectly resulted in fraudulent claim submissions to federal and South Carolina government programs.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4. This Court has personal jurisdiction and venue over Defendant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

5. In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims pleaded or which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because at least one Defendant resides in or transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Relator is familiar with Defendant's fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

7. This case is not based on a public disclosure within the meaning of the FCA, and Relator is the original source of the allegations contained herein. Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary.

However, as a precautionary measure, in the event there has been a public disclosure, Relator made a pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2). Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing her False Claims Act complaint.

## III. PARTIES

8. Relator Karen Mathewson is an employee of Premier and is a resident of Simpsonville, Greenville County, South Carolina. She attended nursing school in an accelerated program from 1984 through 1986, and graduated with a state license as an LPN. She also attended Edison Community College and majored in Emergency Medicine She graduated from that program in 1988 with another state license. She worked for the next 30 years as a nurse while receiving on-the-job training to become a medical administrator and credentialing specialist.

9. Defendant Premier Medical, Inc. is a South Carolina corporation, located in Greenville, South Carolina. Its CEO is Kevin Murdock. Its registered agent for service is Kevin Murdock, 118 James St., Greenville, SC 29609. Its principal place of business is 6000A Pelham Road, Greenville, SC 29616.

10. Vessel Medical, Inc. is a South Carolina corporation, located in Greenville, South Carolina. Its CEO is Kevin Murdock. Its registered agent for service is Kevin Murdock, 10 Jack Casey Ct, Fountain Inn, SC 29644. It was formerly known as Med Chem, Inc.

11. The United States is herein named as a Plaintiff pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendant made or caused to be made.

## IV. FACTS

### A. Relator

12. Relator Karen Mathewson is certified as a Licensed Practical Nurse and an EMT/Paramedic.

13. Relator was hired by Premier Medical, Inc. (also known as Vessel Medical, Inc.) in March 2017. She is currently still employed by Premier. She works with Premier's billing and has access to the information that demonstrates the fraud at issue in this case.

### B. Defendant's Fraudulent Billing for Services Not Provided

14. Defendant Premier Medical, Inc., also known as Vessel Medical, Inc. is a medical testing lab in Greenville, South Carolina.

15. Kevin Murdock is the owner and CEO. Tom Lee is the COO. Paul Hodges is the Controller. Michael Conroy is the Billing Manager. Melanie Stallings is the Lab Manager. Russell Cook is the Assistant Lab Manager.

16. Defendant routinely bills the Government for tests not performed. Defendant's fraud can be easily identified through Defendant's records, which reflect the tests that were not performed and were still billed to the Government.

17. Defendant's internal records reflect that the tests were not performed, with codes such as "TNP" indicating "Test Not Performed," or "QNS" indicating that the

"Quantity [of the specimen was] Not Sufficient" for the tests to be performed. Defendant's records will reflect that they still billed the Government for these unperformed tests.

18. Additionally, Defendant generates a TNP (Test Not Performed) report on a daily basis listing tests that were not performed.

19. Defendant employs "accessioners" who handle the specimens and log the test results. They note when tests cannot be performed for various reasons, such as insufficient quantity of the sample. This information is given to Russell Cook, Defendant's Assistant Lab Manager. He signs off on the specimens, confirming that Defendant is unable to perform the test. Russell Cook passes this information along to Nancy Wilson (in Defendant's billing department.) Ms. Wilson is in charge of notifying the physician's office that the tests were not performed, and is supposed to place a check mark box in the "NO CHARGE" column in that patient's chart for the tests that were not performed. When the "NO CHARGE" box is checked for a test, Defendant's billing system does not bill for the test. When the "NO CHARGE" box is *not* checked, Defendant bills for the test.

20. Defendant does not check the "NO CHARGE" box for these unperformed tests and thus bills the Government (and others) for tests not performed. Defendant is getting paid by the Government (and others) for tests that they are not performing.

21. Additionally, when ICD codes (International Classification of Diseases diagnostic codes) are missing from patients' charts, Defendant simply fabricates codes or takes codes from the patients' prior tests. Defendant is not using patients' current ICD Codes to process the claims.

22. April Rice, one of Defendant's sales representatives, told Relator to use Codes from an old requisition and then put in the comments that the office manager at that physician's office provided the Codes. She actually took a patient's codes and used them on another patient.

23. The following are some representative examples of Defendant's fraud. For purposes of confidentiality, patient names are omitted from this Complaint, but the patients are identified in Relator's Disclosures.

24. Patient 1's file shows four tests, identified as 794 (HeartPro Metabolic), 1035 (HP CMP), 488 (GGT) and 572 (C-Peptide). Under the column for each of these tests, the "No Charge" box is not checked. Her 10/02/2017 file shows "TNP MPO No Suitable Specimen Received." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that no tests were performed on Patient 1's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged Medicare for performing these tests, which were never performed.

25. Patient 2's file shows a Urine Drug Confirmation w/o THC test. The "No Charge" box is not checked. His file shows "TNP MISSING 2 ID." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that no tests were performed on Patient 2's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged Medicare for performing these tests despite the fact that they were never performed.

26. Patient 3's tests were billed to California Insurance Guarantee Association ("CIGA"). Her file shows a Urine Drug Confirmation. The "No Charge" box is not

checked. Her 07/29/2017 file also shows "TNP MISSING 2 ID." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that no tests were performed on Patient 3's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged Medicare for performing these tests that were never performed.

27. Patient 4's claim was submitted to CareSource of Ohio, a Medicaid managed-care plan that provides health care services to Ohio residents eligible for Aged, Blind or Disabled and Covered Families and Children (including Healthy Start and Healthy Families). Her file shows multiple tests, including Vitamin D 25 Hydoxy, LC/MS.MS. Under the column for each of these tests, the "No Charge" box is not checked. Her 10/02/2017 file shows "TNP Vitamin D 25 Hydoxy, LC/MS.MS." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that this tests was not performed on Patient 4's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged the Ohio Medicaid managed-care plan for performing the Vitamin D 25 Hydoxy, LC/MS.MS test, which was never performed.

28. Patient 5 is a 74-year old patient covered by Medicare. Her file shows Test #2185 Myeloperoxidase, C. The box under the "No Charge" column is not checked for the testing of her September 5, 2017 sample. Handwritten on the bottom of the page is "QNS [Quantity Not Sufficient] – sample not enough to test." Her file also indicates TNP (Test Not Performed) and QNS (Quantity Not Sufficient).

29. Patient 6 is a Medicare patient. Her file shows four tests, identified as Z00.00 (General adult medical exam), Z13.220 (lipid), and I10 (hypertension). These tests were not performed, but Defendant still billed Medicare for the tests.

30. Patient 7, Accession No. 268564, Client #2594, was insured by Medicare Palmetto GBA. Document No. 020 is a screenshot of a report, which shows that Defendant billed Medicare on or around 11/29/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. The test is reflected in Defendant's records as, "Plasma tube empty QNS." The abbreviation, "QNS" signifies that the Quantity was Not Sufficient for the test to be performed.

31. Patient 8, Accession No. 280319, Client #2600, was insured by Medicare Palmetto GBA. Document No. 020 is a screenshot of a report, which shows that Defendant billed Medicare on or around 11/28/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. The test is reflected in Defendant's records as, "TNP." The abbreviation, "TNP" signifies that the Test was Not Performed.

32. Patient 9, Accession No. 268553, Client #2604, was insured by Medicare Palmetto GBA. Document No. 020 is a screenshot of a report, which shows that Defendant billed Medicare on or around 11/29/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. The test is reflected in Defendant's records as, "TNP." The abbreviation, "TNP" signifies that the Test was Not Performed.

33. Patient 10, Accession No. 947655, Client #2417, was insured by Medicare Palmetto GBA. Document No. 021 is a screenshot of a report, which shows that Defendant billed Medicare on or around 12/5/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. Document No. 022 is a report stating

that Patient 10's sample was never tested because of QNS (Quantity Not Sufficient), which was caused by the sample spilling during transport.

## V. THE MEDICARE PROGRAM

34. In 1965, Congress passed Title XVIII of the Social Security Act to pay for certain healthcare services for eligible individuals. 42 U.S.C. §§ 1395 *et seq.* Medicare Part A covers hospitalization costs, services rendered by skilled nursing facilities, home health care, and hospice care, while Part B covers physician services, outpatient care, and other miscellaneous services such as physical therapy. *See* 42 U.S.C. §§ 1395j-1395w-4.

35. The U.S. Department of Health and Human Services ("HHS") is a federal agency whose activities, operations, and contracts are paid from federal funds. The Center for Medicare and Medicaid Services ("CMS") is a division of HHS that administers the Medicare program. To administer Medicare reimbursement claims, HHS contracts with private local insurance companies, known as "carriers" and "fiscal intermediaries," to review and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395u. Defendant is legally obligated to familiarize itself with Medicare's reimbursement rules, including those set forth in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 64-65 (1984).

36. The Secretary of HHS has broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs ..." 42 U.S.C. §1395hh(a)(1). In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the

Medicare programs, through the issuance of manual instructions, interpretive rules, statements of policy, and guidelines of general applicability. 42 U.S.C. §1395hh(c)(1).

37. To submit Medicare reimbursement claims, providers submit an Electronic Data Interchange Enrollment Form which contains several provisions, including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare only pays for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(l)(A). It is illegal to provide and bill for medically unnecessary services and equipment. Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition.

## VI. THE FALSE CLAIMS ACT

38. The False Claims Act provides, *inter alia*, that any person who--

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

39. The term “claim” includes “any request or demand, whether under a contract or otherwise, for money . . . that—

> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government’s behalf or to advance a Government program or interest, and if the United States Government--
>
> (I) provides or has provided any portion of the money or property requested or demanded; or
>
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

40. Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government’s behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty for each claim between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017, plus three times the actual damages that the Government sustained. 31 U.S.C. §

3729(a). The Act permits assessment of the civil penalty even without proof of specific damages.

41. The FCA defines a "claim" for payment to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Accordingly, pursuant to the express language of the FCA and the statutory definition of "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the FCA.

## VII. DEFENDANT'S VIOLATIONS OF THE FCA

42. Defendant routinely and systematically violated the FCA by wrongfully obtaining and retaining substantial funds from Government healthcare programs—including but not limited to Medicare, Medicaid, Tricare/CHAMPUS, and the Veterans Administration ("VA")—through false claims and false statements made in connection with medical services provided by Defendant, since at least 2017 and likely much earlier.

43. As described above, Defendant knowingly submits these false claims by billing for procedures that were never performed.

44. Defendant's false and fraudulent scheme has defrauded the Government out of large sums of money.

## VIII. CAUSES OF ACTION

**COUNT ONE**

**FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)**

45. All paragraphs of this Complaint are incorporated herein by reference.

46. Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government in the form of billing for tests that were never performed, as described above.

47. These fraudulent claims were material in that the United States paid Defendant in reliance on Defendant's claims that it had actually performed the tests.

48. As a result of these false or fraudulent claims, the United States Government suffered damages.

49. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as described above.

50. The United States paid the false claims described herein.

51. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims.

52. By virtue of the acts described above, Defendant knowingly presented or caused to be presented to the United States false or fraudulent Medicare and Medicaid claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

53. By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## COUNT TWO

## FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)

54. All paragraphs of this Complaint are incorporated herein by reference.

55. Defendant knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

56. As a result of these false records or statements, the United States Government suffered damages.

57. By virtue of the acts described above, Defendant knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B); that is, Defendant knowingly made or used or caused to be made or used false Medicare claim forms, false supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States.

58. By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

**PRAYER**

WHEREFORE, Relator prays for the following relief for her FCA claims:

1. A permanent injunction requiring Defendant to cease and desist from violating the federal FCA;

2. Judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendant's unlawful conduct;

3. Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendant, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

4. An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

5. Such other relief as the Court deems just and equitable.

## IX. JURY DEMAND

Relator hereby demands a trial by jury.

Respectfully submitted,

s/ Herbert W. Louthian Jr.
Herbert W. Louthian, Jr. (Fed ID #2729)
bert@louthianlaw.com
LOUTHIAN LAW FIRM, P.A.
P.O. BOX 1299
Columbia, SC 29202
Telephone: (803) 454-1200
Facsimile: (803) 256-6033

Cory S. Fein
Cory S. Fein (pro hac vice to be filed)
cory@coryfeinlaw.com
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)

ATTORNEYS FOR RELATOR, KAREN MATHEWSON

Columbia, South Carolina

January 26, 2018