**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | C.A. No. 6:18-cv-00165-TMC |
| ex rel. [UNDER SEAL], | |
| Plaintiff-Relator, | |
| v. | **SECOND AMENDED COMPLAINT** |
| [UNDER SEAL], | **(Jury Trial Demanded)** |
| Defendant. | |

**FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)
(Exempt from ECF)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF GEORGIA, AND STATE OF COLORADO<br>    Plaintiffs,<br><br>*ex rel.* KAREN MATHEWSON<br><br>    Plaintiff-Relator<br><br><br>v.<br><br>PREMIER MEDICAL, INC., KEVIN MURDOCK, MICHAEL CONROY, AND DAKOTA WHITE<br><br>    Defendants. | C.A. No. 6:18-cv-00165<br><br><br><br><br><br><br><br>**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Robert Mathewson, as personal representative of the Estate of the deceased Relator Karen Mathewson, files this Second Amended Complaint against Premier Medical, Inc., Kevin Murdock, Michael Conroy, and Dakota White (hereinafter, "Premier" or "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    This action is brought on behalf of Relator, the United States, and the states of Colorado and Georgia pursuant to the False Claims Act, 31 U.S.C. sections 3729, *et seq.*, the Colorado Medicaid False Claims Act, § 25.5-4-303.5, et seq.), and the

2

Georgia Taxpayer Protection False Claims Act, §§ 23-3-120 to 23-3-127 and State False Medicaid Claims Act, §§ 49-4-168 to 49-4-168.6).

2.      This action concerns false and fraudulent statements, reports and claims for payment that Defendant routinely and intentionally submitted to federal and state government programs, including Medicare, Medicaid, CHAMPVA, TRICARE, and/or CHAMPUS (hereinafter, the "Government"), and to various Medicare Advantage Organizations ("MAOs") which indirectly resulted in fraudulent claim submissions to federal and South Carolina, Colorado and Georgia government programs. It also concerns kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(l),(2).

## II.    JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4.      This Court has personal jurisdiction and venue over Defendant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

5.      In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims pleaded or which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because at least one Defendant resides in or transact business in

this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Relator is familiar with Defendant's fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

7.     This case is not based on a public disclosure within the meaning of the FCA, and Relator is the original source of the allegations contained herein. Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made a pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2).   Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing her False Claims Act complaint.

### III.    PARTIES

8.     Relator Karen Mathewson was an employee of Premier and was a resident of Simpsonville, Greenville County, South Carolina. She attended nursing school in an accelerated program from 1984 through 1986, and graduated with a state license as an LPN. She also attended Edison Community College and majored in Emergency Medicine She graduated from that program in 1988 with another state

license. She worked for the next 30 years as a nurse while receiving on-the-job training to become a medical administrator and credentialing specialist.

9.    Robert Mathewson substituted in as personal representative of the estate of Relator Karen Mathewson, after Karen died. (*See* Docket No. 18.)

10.    Defendant Premier Medical, Inc. is a South Carolina corporation, located in Greenville, South Carolina. Its CEO is Kevin Murdock. Its registered agent for service is Kevin Murdock, 118 James St., Greenville, SC 29609. Its principal place of business is 6000A Pelham Road, Greenville, SC 29616.

11.    Vessel Medical, Inc. is a South Carolina corporation, located in Greenville, South Carolina. Its CEO is Kevin Murdock. Its registered agent for service is Kevin Murdock, 10 Jack Casey Ct, Fountain Inn, SC 29644. It was formerly known as Med Chem, Inc.

12.    The United States is herein named as a Plaintiff pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendant made or caused to be made.

13.    The State of Georgia is herein named as a Plaintiff pursuant to the Georgia Taxpayer Protection False Claims Act, §§ 23-3-120 to 23-3-127 and State False Medicaid Claims Act, §§ 49-4-168 to 49-4-168.6).as funds of the State of Georgia have been directly or indirectly paid to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendant made or caused to be made.

14.    The State of Colorado is herein named as a Plaintiff pursuant to the Colorado Medicaid False Claims Act, § 25.5-4-303.5, et seq., as funds of the State of Colorado have been directly or indirectly paid to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendant made or caused to be made.

## IV.    FACTS

### A.    Relator

15.    Relator Karen Mathewson is certified as a Licensed Practical Nurse and an EMT/Paramedic.

16.     Relator was hired by Premier Medical, Inc. (also known as Vessel Medical, Inc.) in March 2017. She worked for Premier from March 2017 until she quit in February 2018. She worked with Premier's billing and has access to the information that demonstrates the fraud at issue in this case.

### B.    Defendant's Fraudulent Billing for Services Not Provided

17.    Defendant Premier Medical, Inc., also known as Vessel Medical, Inc. is a medical testing lab in Greenville, South Carolina.

18.    Kevin Murdock is the owner and CEO. Tom Lee is the COO. Paul Hodges is the Controller. Michael Conroy is the Billing Manager. Melanie Stallings is the Lab Manager. Russell Cook is the Assistant Lab Manager.

19.    Defendant routinely bills the Government for tests not performed. Defendant's fraud can be easily identified through Defendant's records, which reflect the tests that were not performed and were still billed to the Government.

20.     Defendant's internal records reflect that the tests were not performed, with codes such as "TNP" indicating "Test Not Performed," or "QNS" indicating that the "Quantity [of the specimen was] Not Sufficient" for the tests to be performed. Defendant's records will reflect that they still billed the Government for these unperformed tests.

21.     Additionally, Defendant generates a TNP (Test Not Performed) report on a daily basis listing tests that were not performed.

22.     Defendant employs "accessioners" who handle the specimens and log the test results. They note when tests cannot be performed for various reasons, such as insufficient quantity of the sample. This information is given to Russell Cook, Defendant's Assistant Lab Manager. He signs off on the specimens, confirming that Defendant is unable to perform the test. Russell Cook passes this information along to Nancy Wilson (in Defendant's billing department.) Ms. Wilson is in charge of notifying the physician's office that the tests were not performed, and is supposed to place a check mark box in the "NO CHARGE" column in that patient's chart for the tests that were not performed. When the "NO CHARGE" box is checked for a test, Defendant's billing system does not bill for the test. When the "NO CHARGE" box is *not* checked, Defendant bills for the test.

23.     Defendant does not check the "NO CHARGE" box for these unperformed tests and thus bills the Government (and others) for tests not performed. Defendant is getting paid by the Government (and others) for tests that they are not performing.

24.     Additionally, when ICD codes (International Classification of Diseases diagnostic codes) are missing from patients' charts, Defendant simply fabricates codes

or takes codes from the patients' prior tests. Defendant is not using patients' current ICD Codes to process the claims.

25.    April Rice, one of Defendant's sales representatives, told Relator to use Codes from an old requisition and then put in the comments that the office manager at that physician's office provided the Codes. She actually took a patient's codes and used them on another patient.

26.    The following are some representative examples of Defendant's fraud. For purposes of confidentiality, patient names are omitted from this Complaint, but the patients are identified in Relator's Disclosures.

27.    Patient 1's file shows four tests, identified as 794 (HeartPro Metabolic), 1035 (HP CMP), 488 (GGT) and 572 (C-Peptide). Under the column for each of these tests, the "No Charge" box is not checked. Her 10/02/2017 file shows "TNP MPO No Suitable Specimen Received." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that no tests were performed on Patient 1's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged Medicare for performing these tests, which were never performed.

28.    Patient 2's file shows a Urine Drug Confirmation w/o THC test. The "No Charge" box is not checked. His file shows "TNP MISSING 2 ID." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that no tests were performed on Patient 2's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged Medicare for performing these tests despite the fact that they were never performed.

29.    Patient 3's tests were billed to California Insurance Guarantee Association ("CIGA"). Her file shows a Urine Drug Confirmation. The "No Charge" box is not checked. Her 07/29/2017 file also shows "TNP MISSING 2 ID." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that no tests were performed on Patient 3's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged Medicare for performing these tests that were never performed.

30.    Patient 4's claim was submitted to CareSource of Ohio, a Medicaid managed-care plan that provides health care services to Ohio residents eligible for Aged, Blind or Disabled and Covered Families and Children (including Healthy Start and Healthy Families). Her file shows multiple tests, including Vitamin D 25 Hydoxy, LC/MS.MS. Under the column for each of these tests, the "No Charge" box is not checked. Her 10/02/2017 file shows "TNP Vitamin D 25 Hydoxy, LC/MS.MS." The abbreviation "TNP" stands for "Tests Not Performed." This indicates that this tests was not performed on Patient 4's sample. Accordingly, the "No Charge" box should have been checked. These documents demonstrate that Defendant charged the Ohio Medicaid managed-care plan for performing the Vitamin D 25 Hydoxy, LC/MS.MS test, which was never performed.

31.    Patient 5 is a 74-year old patient covered by Medicare. Her file shows Test #2185 Myeloperoxidase, C. The box under the "No Charge" column is not checked for the testing of her September 5, 2017 sample. Handwritten on the bottom of the page is "QNS [Quantity Not Sufficient] – sample not enough to test." Her file also indicates TNP (Test Not Performed) and QNS (Quantity Not Sufficient).

32.     Patient 6 is a Medicare patient. Her file shows four tests, identified as Z00.00 (General adult medical exam), Z13.220 (lipid), and I10 (hypertension). These tests were not performed, but Defendant still billed Medicare for the tests.

33.     Patient 7, Accession No. 268564, Client #2594, was insured by Medicare Palmetto GBA. Document No. 020 is a screenshot of a report, which shows that Defendant billed Medicare on or around 11/29/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. The test is reflected in Defendant's records as, "Plasma tube empty QNS." The abbreviation, "QNS" signifies that the Quantity was Not Sufficient for the test to be performed.

34.     Patient 8, Accession No. 280319, Client #2600, was insured by Medicare Palmetto GBA. Document No. 020 is a screenshot of a report, which shows that Defendant billed Medicare on or around 11/28/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. The test is reflected in Defendant's records as, "TNP." The abbreviation, "TNP" signifies that the Test was Not Performed.

35.     Patient 9, Accession No. 268553, Client #2604, was insured by Medicare Palmetto GBA. Document No. 020 is a screenshot of a report, which shows that Defendant billed Medicare on or around 11/29/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. The test is reflected in Defendant's records as, "TNP." The abbreviation, "TNP" signifies that the Test was Not Performed.

36.     Patient 10, Accession No. 947655, Client #2417, was insured by Medicare Palmetto GBA. Document No. 021 is a screenshot of a report, which shows that Defendant billed Medicare on or around 12/5/2017 for a diagnosis test on this patient. Relator has verified that the test was never done. Document No. 022 is a report stating

that Patient 10's sample was never tested because of QNS (Quantity Not Sufficient), which was caused by the sample spilling during transport.

## V.    THE MEDICARE PROGRAM

37.    In 1965, Congress passed Title XVIII of the Social Security Act to pay for certain healthcare services for eligible individuals.  42 U.S.C. §§ 1395 *et seq.*  Medicare Part A covers hospitalization costs, services rendered by skilled nursing facilities, home health care, and hospice care, while Part B covers physician services, outpatient care, and other miscellaneous services such as physical therapy. *See* 42 U.S.C. §§ 1395j-1395w-4.

38.    The U.S. Department of Health and Human Services ("HHS") is a federal agency whose activities, operations, and contracts are paid from federal funds.  The Center for Medicare and Medicaid Services ("CMS") is a division of HHS that administers the Medicare program. To administer Medicare reimbursement claims, HHS contracts with private local insurance companies, known as "carriers" and "fiscal intermediaries," to review and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395u. Defendant is legally obligated to familiarize itself with Medicare's reimbursement rules, including those set forth in the Medicare Manuals.  *Heckler v. Cmty. Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984).

39.    The Secretary of HHS has broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs ..." 42 U.S.C. §1395hh(a)(1). In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the

Medicare programs, through the issuance of manual instructions, interpretive rules, statements of policy, and guidelines of general applicability. 42 U.S.C. §1395hh(c)(1).

40.     To submit Medicare reimbursement claims, providers submit an Electronic Data Interchange Enrollment Form which contains several provisions, including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare only pays for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(l)(A). It is illegal to provide and bill for medically unnecessary services and equipment. Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition.

## VI.     THE FALSE CLAIMS ACT

41.     The False Claims Act provides, *inter alia*, that any person who--

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . .  or

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

42.     The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)     will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

43.     Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government's behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty for each claim between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017, plus three times the actual damages that the Government sustained. 31 U.S.C. §

3729(a). The Act permits assessment of the civil penalty even without proof of specific damages.

44.     The FCA defines a "claim" for payment to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Accordingly, pursuant to the express language of the FCA and the statutory definition of "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the FCA.

## VII.     DEFENDANT'S VIOLATIONS OF THE FCA

45.     Defendant routinely and systematically violated the FCA by wrongfully obtaining and retaining substantial funds from Government healthcare programs— including but not limited to Medicare, Medicaid, Tricare/CHAMPUS, and the Veterans Administration ("VA")—through false claims and false statements made in connection with medical services provided by Defendant, since at least 2017 and likely much earlier.

46.     As described above, Defendant knowingly submits these false claims by billing for procedures that were never performed.

47.     Defendant's false and fraudulent scheme has defrauded the Government out of large sums of money.

## VIII.   THE ANTI-KICKBACK STATUTE

48.    The Anti-Kickback Statute ("AKS") prohibits any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of any goods or services for which payment may be made, in whole or in part, under a federal health program, including Medicare. 42 U.S.C. § 1320a-7b(b)(l),(2).

49.    The AKS is intended to prevent arrangements that can lead to unfair competition, the distortion of medical decision-making, overutilization of services and supplies, and increased costs to Federal health care programs. *See* 65 Fed. Reg. 59,434, 59,440 (Oct. 5, 2000). To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

50.    For the purposes of the AKS, "remuneration" includes the transfer of anything of value, "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)(l).

51.    The AKS's legislative history confirms Congress's intent to interpret the term "remuneration" broadly. See 123 Cong. Rec. 30,280 (1977) (Statement of Rep.

Rostenkowski), cited at 56 Fed. Reg. 35,952, 35,958 (July 29, 1991) (Final Rule regarding AKS Safe Harbors).

52.     The knowing and willful payment of remuneration to a physician – or the knowing and willful receipt of remuneration by a physician - violates the AKS when even one purpose of the transaction is to induce the referral - or generation - of federal health program-related business. The term "referral" is used herein to stand in for the language in the AKS, including arranging for or recommending the ordering of goods for which Medicare pays.

53.     An individual who violates the AKS is also subject to exclusion from participation in federal health care programs and, as of August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

54.     The United States Department of Health and Human Services Office of Inspector General (HHS-OIG) has promulgated "safe harbor" regulations that identify six payment practices that are not subject to the AKS because such practices are unlikely to result in fraud or abuse. See 42 C.F.R. § 1001.952. Safe harbor protection is afforded only to those arrangements that meet all of the specific conditions set forth in the safe harbor. Defendant's conduct in this matter did not comply with any safe harbors.

55.     In 2010, Congress amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111–148 § 6402(f), 124 Stat. 119, 759 (codified at 42 U.S.C.§ 1320a–7b(g)). According to PPACA's legislative history, this amendment to the

AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

56.    Compliance with the AKS is a condition of payment under federal health care programs, and providers participating in the Medicare and Medicaid programs must agree to comply with the AKS and certify such compliance.

57.    As a condition of payment, Medicare providers such as physicians and surgical facilities must certify compliance with the AKS. The United States relied upon these health care providers' compliance with federal health care laws, including the certifications of compliance submitted or caused to be submitted.

58.    These false certifications are material. For decades, compliance with the AKS has been material to the United States' decision to pay Medicare claims. The United States has continuously brought suit and pronounced publicly that it will not use taxpayer money to reimburse services arranged for through the use of unlawful inducements.

59.    Compliance with the AKS was a condition of payment and a material requirement for receiving Medicare reimbursement.

60.    It is CMS's policy not to pay claims that are tainted by kickbacks.

## IX.    DEFENDANT'S VIOLATION OF THE ANTI-KICKBACK STATUTE

61.    Defendant was forced to compete in an industry dominated by two major players, LabCorp and Quest. Its business plan to compete with these two dominant

forces was simple—it bribed physician groups to use Defendant by paying them cash kickbacks in violation of the AKS.

62.     During the time Relator worked for Premier (from March 2017 until she quit in February 2018), and presumably earlier and later, Defendant maintained a sales force of about 50 salesmen throughout the United States who made deals with physicians and physician groups whereby they would use Defendant for all their testing purposes in exchange for cash kickbacks.

63.     Defendant's salesmen established relationships with physician practices throughout the country and made agreements to pay them kickbacks in exchange for sending their blood and urine samples to Defendant for testing purposes. Defendant billed Medicare, Medicaid, and TRI-CARE (as well as private insurers) for these tests in violation of the AKS.

64.     Defendant had monthly meetings (on the second Tuesday of every month) wherein its entire sales force from throughout the country would travel to Greenville, South Carolina and participate in day-long meetings at Defendant's headquarters to discuss the implementation of Defendant's kickback scheme.

65.     Jordan Morris was Defendant's sales representative for Pennsylvania, and one of his clients was Allied Addiction Recovery, a drug and alcohol outpatient facility in Western Pennsylvania, www.allieddaddictionrecovery.com.

66.     Bobby Sanders was Defendant's sales representative in Greenville, South Carolina.

67.     Defendant also had several sales representatives in California, including an individual named Edrick, whose boss was Chris Hall.

68.     Defendant, through its salesmen, including Jordan Morris, paid kickbacks to several physicians and physician groups, which Defendant considered to be its clients. These potentially included the following clients of Defendant, with their client numbers: Lev S. Simkhayev, MD (2589); South Omaha Medical (2594); RS Medical (2600); Fletcher Family Medical Center (2604); Dr. Uchechi Opaigbeogu (2608); Panacea Clinic (2610); Primary Medicine of Sherman (2620); Spectrum Health Center (2624); Family Wellness Center (2628); New Light Primary Care LLC (2630); Willow Pain and Wellness (2648); United Clinics (2393); Randy Higashi, Inc. (2394); Healthy Living Medical Services (2417); Georgia Pain Assoc. Tucker (2439); and In-Kare (2453). Relator specifically recalls kickback agreements with United, Higashi, and United Heathcare of East Los Angeles.

69.     Two additional companies that had illegal kickback arrangements with Premier were: (1) HealthCare with Heart, LLC - Family Medical Clinic, 823 Center Ave., Payette, Idaho, www.healthcarewithheartllc; and (2) Gulf Coast Pain Institute, www.thegulfcoastpaininstitute.com, main office at 4901 Marketplace Rd., Pensacola, FL 32504, and nine locations throughout Florida. Both of these entities recently stopped doing business with Premier because Premier stopped making the agreed kickback payments.

70.      In return for these kickbacks, these clients used Defendant to test blood and urine samples of their patients, including patients covered by Medicare, Medicaid and TRI-CARE.

71.     Defendant billed Medicare, Medicaid and TRI-CARE for these tests in violation of the Anti-Kickback Statute.

72.     Relator learned of these facts through her role working for Defendant.

73.     As part of her job, Relator was required to obtain missing billing information (for example, missing diagnostic codes) for patients whose samples were submitted to Defendant with paperwork that omitted this information. Defendant needed this information in order to bill Medicare, Medicaid and TRI-CARE, and Relator's job included contacting the clients to obtain this patient information.

74.     Frequently, Relator would be unable to obtain the missing information from the physician groups and would contact the sales representative for that physician group to ask for his assistance in obtaining the information. Often the sales representative would reply that the physician group was refusing to provide the information because Defendant had failed to pay the agreed kickback.

75.     In most instances, Defendant did pay the agreed kickback and the physicians continued sending samples to Defendant for testing, and Defendant billed Medicare, Medicaid and TRI-CARE for these tests, which were tainted by the kickbacks.

76.     The kickbacks were in the form of cash paid by Defendant to its "clients", i.e., the physicians, physician groups, and clinics that sent the samples to Defendant.

77.     Relator learned of another type of fraud when making these calls. Often she would learn that one of Defendant's clients' was billing for a doctor who did not have an NPI number. Defendant needed to have a valid doctor with a valid NPI number ordering the tests. In these situations, Defendant would simply choose another doctor with a valid NPI number and substitute that doctor's name as the doctor ordering the lab tests.

## X.    CAUSES OF ACTION

### COUNT ONE

### FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)

78.    All paragraphs of this Complaint are incorporated herein by reference.

79.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government in the form of billing for tests that were never performed, as described above.

80.    These fraudulent claims were material in that the United States paid Defendant in reliance on Defendant's claims that it had actually performed the tests.

81.    As a result of these false or fraudulent claims, the United States Government suffered damages.

82.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as described above.

83.    The United States paid the false claims described herein.

84.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims.

85.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented to the United States false or fraudulent Medicare and Medicaid claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

86.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## COUNT TWO

## FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)

87.    All paragraphs of this Complaint are incorporated herein by reference.

88.    Defendant knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

89.    As a result of these false records or statements, the United States Government suffered damages.

90.    By virtue of the acts described above, Defendant knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B); that is, Defendant knowingly made or used or caused to be made or used false Medicare claim forms, false supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States.

22

91.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## COUNT THREE

### Violation of False Claims Act by Submission of Claims Tainted by Violations of Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)

92.    A claim that includes items or services resulting from a violation of the Anti-Kickback statute constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C.§ 1320a–7b(g)). Defendant submitted claims to federal health care programs (including Medicare, Medicaid and TRICARE) for testing of samples sent to them by physicians, and physician groups who had illegal kickback agreements with Premier. Accordingly, Defendant's offers and payments of kickbacks (as described above) violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and thus each claim for payment tainted by a kickback violated the False Clams Act.

93.    As a result of Defendant's offer and payment of kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), false and fraudulent claims for payment were made to federal health care programs. Defendant's compliance with the Anti-Kickback Statute was material to the Government's decision to pay the health care

claims. Defendant knowingly caused to be presented materially false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. 31 U.S.C. § 3729(a)(1)(A).

## **COUNT FOUR**

### **Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(a)**

94.    All paragraphs of this Complaint are incorporated herein by reference.

95.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, et seq.

96.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Colorado Medicaid Program, false or fraudulent claims for payment or approval for improper payment for testing of samples sent to them by physicians, and physician groups who had illegal kickback agreements with Premier.

97.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

98.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## **COUNT FIVE**

### **Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(b)**

99.    All paragraphs of this Complaint are incorporated herein by reference.

100.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, et seq.

101.   By virtue of the conduct described above, Defendants knowingly made, used, or caused to made or used, false records or statements material to a false or fraudulent claim made to the Colorado Medicaid Program for improper payment for testing of samples sent to them by physicians, and physician groups who had illegal kickback agreements with Premier.

102.   The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

103.   By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIX

### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1)

104.   All paragraphs of this Complaint are incorporated herein by reference.

105.   This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1).

106.   By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Georgia Medicaid Program, false or fraudulent claims for payment or approval for improper payment for testing of samples sent to them by physicians, and physician groups who had illegal kickback agreements with Premier.

107.   The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

108.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVEN

### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2)

109.    All paragraphs of this Complaint are incorporated herein by reference.

110.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2).

111.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to made or used, false records or statements material to a false or fraudulent claim made to the Georgia Medicaid Program for improper payment for testing of samples sent to them by physicians, and physician groups who had illegal kickback agreements with Premier.

112.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

113.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT

### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(l)

114.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(l).

116.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Georgia Medicaid Program, and other Government-funded health insurance programs, false or fraudulent claims for improper payment for testing services.

117.    Georgia, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

118.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINE

### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2)

119.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2).

121.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements to the Georgia Medicaid Program and other Government-funded health insurance programs material to false or fraudulent claims for improper payment for testing services.

122.    Georgia, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

123.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## PRAYER

WHEREFORE, Relator prays for the following relief for her FCA claims:

1.      A permanent injunction, requiring Defendants to cease and desist from violating the federal FCA;

2.      Judgment against Defendants in an amount equal to three times the amount of damages the United States, South Carolina, Georgia and Colorado have sustained as a result of the Defendant's unlawful conduct;

3.      Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

4.      An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

5.      An award to Relator for the maximum amount allowed as Relator's share pursuant to the Georgia False Medicaid Claims Act, GA. Code Ann. §49-4-168.1(a)(1) and § 49-4-168.1(A)(2); Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)( I ); Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2); and the federal False Claims Act, 31 U.S.C. §3730.

6.      Such other relief as the Court deems just and equitable.

## XI.    JURY DEMAND

Relator hereby demands a trial by jury.

Respectfully submitted,

/s/ Herbert W. Louthian Jr.
Herbert W. Louthian, Jr. (Fed ID #2729)
bert@louthianlaw.com
LOUTHIAN LAW FIRM, P.A.
P.O. BOX 1299
Columbia, SC 29202
Telephone: (803) 454-1200
Facsimile:  (803) 256-6033

Cory S. Fein (pro hac vice)
cory@coryfeinlaw.com
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)


ATTORNEYS FOR ROBERT
MATHEWSON, ON BEHALF OF
RELATOR, KAREN MATHEWSON,
DECEASED